## John Morissey and others v. The People.

Whether the State can lawfully provide for the punishment in Michigan of persons who having committed a larceny in a foreign country bring the stolen property into the State, *quere:* the Court being equally divided on the question.

If the statute for that purpose—Comp. L. § 5797—is valid, whether an information under it is sufficient which charges the defendant in the ordinary form with a larceny committed in this State, *quere:* the Court being equally divided on the question.

Where an examination has been had before a magistrate on a criminal charge, and the accused is discharged, an information can not afterwards be filed against him for the same offense.

If an information is filed after examination and discharge, the defendant may prove those facts in bar of the prosecution, under the plea of not guilty.

Under the act of March 11, 1861, the wife of a defendant in a criminal prosecution may be examined as a witness on behalf of a co-defendant of her husband.

An objection to a question that it is leading must be taken before the question is answered. Per MANNING J.

A judgment can be reversed only for errors appearing on the face of the record. Where a question put to a witness is objected to, the reason for the objection must be stated, and must appear by the bill of exceptions, or it can not be presumed on error that it was erroneously overruled. Per MANNING J.

The question "Will you state whether or not in your judgment the samples now shown to you are off the pieces that were stolen," is not objectionable as being leading. Per MANNING J.

Where this question is put to a witness shown to have been acquainted with the piece stolen, it is not objectionable on the ground that the witness has not been shown to be an expert. Per MANNING J.

*Heard October 25th, 1862. Decided May 20th.*

Error to the Recorder's Court of Detroit.

A sufficient statement of the facts will be found in the opinion of Justice Manning.

*G. V. N. Lothrop, J. K. Gavin,* and *M. J. O'Riley,* for plaintiffs in error.

*C. Upson, Attorney General,* for the People.

MANNING J.:

The plaintiffs in error were convicted of larceny on an information charging the larceny to have been committed in the city of Detroit. On the trial it appeared the articles mentioned in the information were taken from a store that was broken open on the night of the 19th of November, 1860, at Windsor, on the opposite side of the Detroit River, in Canada, and were brought over the river to the city.

On the trial the evidence to prove these facts was objected to, on two grounds: 1st, That the information did not charge the larceny to have been committed in Canada; and, 2d, That the statute—*Comp. L.* § 5797—is unconstitutional.

The statute is in these words: "Every person who shall feloniously steal the property of another, in any other state or country, and shall bring the same into this State, may be convicted and punished in the same manner as if such larceny had been committed in this State; and

in every such case such larceny may be charged to have been committed in any town or city into or through which such stolen property shall have been brought."

Whether a person committing theft in another state or country and bringing the stolen property into Michigan, would be guilty of larceny in Michigan, independent of the statute, we need not stop to inquire, as the statute removes all doubt on that subject, if any previously existed, and I entertain no doubt as to the constitutionality of the statute :— *Tyler v. The People*, 8 *Mich.* 320.

The other objection—that the information did not state the larceny was committed in Canada — would seem to rest on the erroneous notion that the prisoners were on trial for what they did in Canada. Such was not the case. They were tried and convicted for a larceny committed by them in the city of Detroit. They were guilty of a like offense for taking · the same goods in Canada. But that was an offense against the laws of Canada, for which they could only be punished in Canada. The statute does not punish them for what they did there, but for the theft of the same goods by them in Michigan.

They acquired no property in the goods by the felonious taking in Canada. The title to personal property is not changed by carrying it from one country into another. It remains the same. And if the title is called in question in the country to which the property has been removed, on a state of facts occurring in the other before the transition, it is to be· determined by the laws of the latter. When the prisoners, therefore, brought the stolen articles to Detroit, they were not theirs. They had no right to them—not even the right of possession. They were the goods of the Messrs. Dougall· from whom ·they had feloniously taken them, and as. such were under the protection of our laws. It was for stealing the goods of the Messrs. Dougall in the State of Michigan that the prisoners were tried and convicted.

11 MICH.—V.

There was therefore no occasion for stating the theft in Canada in the information. It was necessary to show it on the trial, to prove the character of the prisoners' possession of the stolen property; for if that possession was felonious in Canada it was felonious in Michigan. The same goods may be stolen at different times and at different places by the same person. The first theft does not give the thief such an interest in the possession of the thing stolen that he can not steal it a second time by carrying it with him into another state, where he might have been punished for the first offense had it occurred there. The indictment or information must state the crime for which the prisoner is tried, but it need not, and should not, state the evidence by which it is to be proved.

Bell Morrissey, wife of William Morrissey, was properly rejected as a witness for John Morrissey, a co-defendant with her husband in the Court below.

In *Pullen v. The People*, 1 *Doug. Mich.* 48, it was decided that where two persons are jointly charged with the commission of an offense, and neither of them has been convicted or acquitted, the husband of one is not a competent witness for the other. The only difference between that case and this, is, that in that case the husband of one of the defendants was offered as a witness for a co-defendant, who was being tried separately; whereas in this case the proposed witness was a wife of a co-defendant, and all the defendants were being tried together. A difference in circumstances in no way affecting the principle of law applicable to the two cases.

Was the witness competent under Act No. 125 of the Session Laws of 1861? The first section of this act, amending § 4339 of the Compiled Laws, removes the common law disability of witnesses by reason of crime, interest in the suit, or marital relation. It is the last of these, or the removal of the common law disability from marital relation by this section, that we have to consider on the present occasion.

MORRISSEY v. THE PEOPLE.

By the fourth section of the act, it is provided that a husband shall not be examined as a witness for or against his wife, without her consent, nor a wife for or against her husband without his consent. And by section two of the act, amending § 4340 of the Compiled Laws, parties to any suit or proceeding are made competent witnesses therein, with the following proviso: "Nothing in this act shall be construed as giving the right to compel a defendant in criminal cases to testify, but every such defendant shall be at liberty to make a statement to the Court or jury, and may be cross-examined upon any such statement."

In *The People v. Thomas*, 9 *Mich.* 314, we held that a defendant in a criminal case could not be a witness for himself under the act. That case does not cover all the ground of the present case. The only question was, whether the prisoner could be a witness for himself. Not whether he could be a witness for a co-prisoner; and, if he could not, whether his wife could be. Although the case does not go this length, the reason on which the doctrine rests I think does. It is that the second section of the act makes parties witnesses in civil cases only. As the first section does not make parties witnesses, and the second section making them witnesses does not extend to criminal prosecutions, it follows that one defendant in a criminal case cannot be a witness for or against another defendant. And, we can not presume, where the Legislature have withheld the right of a witness from a party, they intended to give it to the wife or husband of such party. There is nothing on which to rest such a conclusion, if it did not contain the elements of refutation within itself. What reason can there be for saying a prisoner shall not be a witness for himself, unless he testifies through his wife? for it amounts to that if she may be a witness for him, with his consent, [and cannot be used against him if he objects.

I will next notice the exception taken on the examination of Oulette. He testified that he was a clerk in Dougall's store, in Canada, and had seen and handled the cloths that were stolen. He was then asked by the prosecution: "Will you state whether or not, in your judgment, these samples now shown to you are off the pieces that were stolen?" The question was objected to, the objection overruled, and an exception was taken. The reason for the objection does not appear in the bill of exceptions. In the brief submitted two are given. *First*, because it does not appear the witness was an expert; *Second*, because the question was leading.

A judgment can be reversed only for errors appearing on the face of the record. Error is not to be presumed.

It is not the · office of a bill of exceptions to state all of the evidence given on the trial, but so much of it only — or a statement in lieu thereof, that there was evidence tending to prove such and such facts — with such other circumstances occurring on the trial, as to make the error patent, if any. Hence the reason for objecting to a witness, or to any question put to him, should appear in the bill of exceptions. The witness is to be presumed competent, and the question put to him pertinent and proper, unless the inadmissibility of the one or the other appears from the record.

It is obvious from the bill of exceptions that the most important question for the jury to pass upon was one of identity. It was whether the cloths seen in the prisoners' possession in the city of Detroit, were the cloths taken from Dougall's store in Canada. Identity may be proved by a variety of circumstances. We know not how to fix any bounds to the proof of circumstances for that purpose. Each case must determine its own limits. Any circumstance that may, of itself or in connection with one or more other circumstances, tend to prove it, is clearly admissible. It is for the jury and not the Court to

determine the weight that should be given to it in making up their verdict.

Oulette was a clerk in Dougall's store, and had seen and handled the cloths that were stolen. He was shown samples of cloths, which we are to presume were taken from the cloths seen in the prisoners' possession in the city of Detroit, and asked the question objected to and. allowed by the Court. His opinion as to their being off the pieces stolen, with the means he had for forming that opinion, and his reasons for it, were circumstances proper for the consideration of the jury.

As to the other objection — that the question was leading — it comes too late, if it would have been good had it been taken in season. It should have been taken before the question was answered, and not after, if it was taken at all on the trial, which does not appear to have been the case from the bill of exceptions. But we do not think the question a leading one in the sense that renders such questions objectionable. In what way could the opinion of the witness be obtained unless he was asked for it? Was he to volunteer it, and to be dogged with questions until he did? Or if he could not be put on scent of the answer he was expected to give by questions leading from it, instead of to it, must justice be sacrificed? and the truth be excluded by the means used to elicit it? Such a course of procedure in the administration of justice would bring the judiciary of the State into contempt, and not without cause.

For reasons already stated, and other like reasons, I see no well founded objection to the evidence of Julius Blodgett, offered for the same purpose.

There was evidence of an examination and discharge of the prisoners by a Justice of the Peace before the information was filed; and the Court was requested to charge the jury that if they should find such to have been the case they must acquit the prisoners.

It is difficult to conceive on what ground this request was made. The statute had been complied with. *Laws 1859, p. 391.* The prisoners had had their examination. For what cause the Justice thought proper to discharge them is immaterial, as the examination and discharge were not a trial and acquittal for the offense.

It was essential to the prosecution that the cloths should have been taken under such circumstances as would be stealing in Canada. The Court so instructed the jury, but refused to charge them that if they did not find from the evidence that a felonious stealing was a criminal offense by the laws of Canada, they must acquit the prisoners. Instead of charging as requested, the Court stated to the jury that the common law must be presumed to be in force in Canada, and that by the common law felonious stealing is a crime.

Stealing is a crime recognized by all laws, human and divine. It therefore seems singular that proof should be required of its being a crime in Canada. It being *malum in se*, and a common law and not a statutory offense — and the common law prevailing in Canada—we are to presume it is a crime there as well as in our own State. I think the Court was not only correct in this, but also in charging that unexplained suspicious possession in Detroit of property recently obtained by larceny in Canada, was presumptive evidence that the possessor committed the larceny in Canada.

To warrant a joint conviction, the prisoners must have jointly brought the property across the river, or been concerned or interested in bringing it to Detroit. This we think is what is meant by the following paragraph in the charge of the Court:

"The information charges a joint crime. You must find a joint possession by the prisoners of the goods in Detroit, or there can be no conviction. You may convict one or more of the prisoners and acquit the others."

MORRISSEY v. THE PEOPLE.

If the Court meant, or was understood by the jury, to say there could not be a conviction of one of the prisoners unless all were concerned in the possession in Detroit, the charge was erroneous. But the judgment should not for that cause be reversed, as the error was in favor of the prisoners, and could not possibly have operated to their prejudice.

I think the judgment of the Recorder's Court should be affirmed.

CAMPBELL J.:

Defendants were convicted of larceny, on evidence directed towards proving a larceny committed in Canada, of goods subsequently brought into Wayne county in this State, where the trial was had.

The questions presented by the bill of exceptions refer to the validity of the statute punishing such acts, the sufficiency of the information, and various rulings on the trial.

The statute provides that " every person who shall feloniously steal the property of another in any other state or country, and shall bring the same into this State, may be convicted and punished in the same manner as if such larceny had been committed in this State, and in every such case such larceny may be charged to have been committed in any town or city into or through which such stolen property shall have been brought; Provided, That every such person may plead a former conviction or acquittal for the same offense in another state or country, and if such plea be admitted or established, it shall be a bar to any further or other proceedings against such person for the same offense." Comp. L. § 5797.

The two succeeding sections punish receivers, aiders and abettors.

It is not claimed by any one that we have the right to punish offenses committed abroad beyond our jurisdic-

tion. Nor have we as a State any right to impose penal
or other conditions for excluding persons from entering
our territory; that intercourse being a matter of national
concern. If a person takes refuge here who has committed
crimes in another state, or abroad, he is to be considered
as a fugitive from justice, and we can not retain him
from reclamation as such upon any claim of our own to
punish the act; and where our Government has not seen
fit to provide for such rendition to foreign powers, it is
not easy to perceive how any State can assume to redress
the grievances of other nations. If we had the power
which is possessed by independent nations, of placing such
conditions on foreign intercourse as we might see fit, we
might exclude criminals on such penalties as we should
enact; but we have no such authority. And we can only
punish men for offenses committed against our own sover-
eignty; which can only embrace acts committed within our
own territory. The question then occurs whether the offense
for which the prisoners were tried is one of that description.

The information charges an ordinary larceny at common
law, by stealing, taking and carrying away property in
Detroit, in the county of Wayne, in this State. It is a
good information for an offense committed in Wayne
county. We have no statutory definition of larceny, and
all our statutes use it in its common law sense. If this
information uses the common law phraseology to denote
something entirely different, then it does not give the
defendants that description of their alleged offense which
is their constitutional right, and no evidence is admissible
under it: — *Norris v. State*, 33 *Miss.* 373 ; *Commonwealth
v. Simpson*, 9 *Met.* 138; *Rex v. Millar*, 7 *C. & P.* 665; 1
*Chit. Cr. L.* 169, 170, 231; *Shannon v. People*, 5 *Mich.*
71. Such a misdescription can derive no aid from legis-
lation. If a legislature could misapply terms by confounding
under one name entirely different things, the Constitution
would cease to be of any use as a restraint. But a con-

struction which involves such unjust consequences to defendants ought not to be adopted under any circumstances if any other can be safely applied.

Is the case offered in proof a common law larceny? There are some authorities in this country which so regard it. But the statute itself is not based upon any such theory, as will appear hereafter from a comparison of its clauses.

And the weight of authority is entirely the other way. There is no description of larceny (and this statute forms no exception to the rule) which does not make the offense consist of a felonious *taking*, and also of a *removal* with felonious intent. Both of these must coincide in order to make out the crime; and both, therefore, must occur within the territory of the sovereignty which punishes them. And as the theft is one act, it was held at common law that it might be punished in any venue within the realm where the property had been carried by the thief. But so essential was the felonious *taking* that where the property was originally taken beyond the realm and brought within it, no larceny was committed in England, the possession being only rendered criminal by the first act of stealing, which was not an act that affected the peace or welfare of the Kingdom. This was held where the original taking was at sea: — 3 *Inst.* 113; 1 *Hawk. P. C. c.* 33, *s.* 52. Or in Scotland before the new statutes, although since the Union. *Rex v. Anderson*, 2 *East P. C.* 772. There are now acts of Parliament reaching all cases where the taking is within the United Kingdom of Great Britain and Ireland. Yet even now, the offense is so limited by locality that a taking in the island of Jersey, which is subject to the British Parliament, but not technically a part of the United Kingdom, is put by the decisions on the same footing with a taking in France, it being held that in neither case can bringing property stolen without the Kingdom into England, be considered larceny in England : — *Rex v. Prowes*, 1 *Moody C. C.* 349; *Regina v. Madge*, 9 *C. & P.* 29.

Although it is loosely said that the continued possession amounts to a new caption and asportation, yet the decisions show that this is not accurately true, for if it were the cases just referred to are incorrect. The real ground of the decisions is that the taking and subsequent felonious possession form one continuous act, which derives its character from the original taking, but which may be punished by the authority offended by such taking in any place within the realm where the offense has been kept up. No one has ever supposed, and certainly no case has ever decided, that a possession of stolen goods in different counties amounted to a succession of separate punishable larcenies. The decisions recognize, in all the continuing possession, but one single offense committed within the jurisdiction. It is in the power of every country to select the place of trial and punishment at its option, and the ordinary rules of locality have nothing to do with the question whether a State can punish offenses not committed within its jurisdiction.

There are some American cases which assume that larceny in one State, followed by possession in another, is punishable in the latter at common law. So far as they purport to rest on English decisions there is no foundation for them, and they do not in general lay down any other source of authority except local usage. The early Massachusetts cases derived the jurisdiction from a supposed analogy between the States of the Union and the counties a State. But this analogy is not a true one, and if it were, would not reach the case before us. In the case of the *Commonwealth v. Uprichard*, 3 *Gray*, 434, which was just such a case as the one we are now considering, the Supreme Court of Massachusetts declined to extend the rule of their early decisions to larcenies committed abroad, and show by very clear and cogent reasoning that punishing the possession of the stolen goods in Massachusetts involves of necessity the inquiry into and punishment of

a foreign crime. The reasoning and the intimations of the Court show the incorrectness of the previous doctrines. The various American cases are collected and considered, and the decision is based upon grounds which are inconsistent with the validity of any attempt to exercise such a jurisdiction.

A defendant who is called upon to respond to an information charging a local common law offense in Michigan, can not be said to be apprised of the charge that the offense was in fact committed in Canada, or that any inquiry is to be made into Canadian transactions. Nor is it possible for him, under an information of this form, to avail himself of the statutory defenses. The statute expressly provides that an acquittal or conviction of the same offense in Canada may be pleaded specially in bar. If the defendants had to this information charging an offense in Wayne county pleaded an acquittal in Canada, there is no process by which it could be shown that the offenses are identical. Until the trial is actually commenced the prisoners can not, and the Court can not, determine whether the offenses are the same. The Canada indictment would not, neither would the Canada proofs, necessarily or probably trace the goods to Detroit; and the Court could not assume that the defendants were not pursued for doing what the accusation fairly implies to have been done in Michigan. The record here instead of agreeing with the Canadian proofs and records varies entirely from them.

And this leads to a consideration of the terms of the statute as seeking directly to punish what it defines expressly as a foreign and not a domestic offense. Those cases which sustain such statutes treat them as punishing not the larceny, but the bringing of the property into the State. This does not relieve the difficulty very much. But this construction is not warranted by the statute. It punishes the *larceny* and nothing else. It provides that the thief

"may be convicted and punished *in the same manner as if such larceny had been committed in this State;* and in every such case *such larceny* may be charged to have been committed in any town, &c." It is the *larceny committed in Canada* which may be charged, convicted and punished, as if committed in Michigan. And it is "a former *conviction or acquittal for the same offense,*" which may be pleaded in bar to *any further or other proceedings against such person for the same offense.*" In other words, it expressly purports to reach a larceny committed abroad, not. even declaring that the importation of the goods shall constitute that offense. · The larceny in Canada is entirely separate from that importation, and yet a conviction or acquittal of it is an acquittal or conviction of "*the same offense*" which the statute punishes.

The most serious·difficulties in the way of a fair trial—apart from the question of territorial ·jurisdiction—are not lessened by the other interpretation. Whatever view may be taken of the real meaning of the statute, it becomes necessary upon the trial to investigate transactions in Canada, and to determine their character under the laws of Canada. It is not within the power of the State of Michigan to compel the attendance of witnesses for the defense from another country. And, where a transaction occurs abroad, it is not only a fair but an inevitable presumption, that most of the witnesses are abroad. Where the main fact to be determined is a criminal act, committed beyond the State, the defendant is likely to be at the mercy of the prosecution. He can not produce either eye-witnesses of the transaction, or impeaching witnesses, unless they choose to present themselves. When· the Constitution assures a defendant "*compulsory process for obtaining witnesses in his favor,*" it can not contemplate a trial for· foreign crimes, where it is not presumable that such witnesses can be compelled to appear. It is also necessary to prove foreign laws as facts; and the foreign common law must

be proved by living witnesses. Even if we could in a criminal case make any presumption concerning a foreign law, that presumption may be overthrown. And although it may be true that stealing is a crime punished by all nations, it is not the same thing in all nations. Some codes make no distinction between larceny and embezzlement. Our statutes embrace under the head of larceny many acts which at common law are only civil trespasses, and not crimes at all. In *Spencer v. The State*, 20 *Ala.* 24, in construing just such a statute as this the Court were compelled by these considerations to limit its operation to larceny at common law, although they thus disregarded a practice recognized in several previous decisions. And it may fairly be doubted whether, if the question should directly arise, they would sustain the law even thus far.

I am of opinion that the defendants were not lawfully held to trial for the larceny which was allowed to be introduced in evidence.

I also think that the statute does not permit informations to be filed where the defendant has been discharged upon his preliminary examination. We held in *The People v. McKinney*, 10 *Mich.* 54, that the trial must be on the same matters concerning which proof was offered on the examination; and the statute is very plain upon that point. But this examination is only returned when the defendant is held upon it, and the law has never sanctioned putting any one to his trial until probable cause has been made to appear by responsible testimony. If a Prosecuting Attorney can assume the right to file an information without this security against abuse, the examination becomes of no account, and is a farce.

I think that Bell Morrissey was a competent witness. The statute of 1861 declares in express terms that "no person shall be excluded from giving evidence in any matter, *civil or criminal*," "by reason of *marital* or other relationship to any party thereto:" *p.* 168, § 1. The only

qualification is that husband and wife can not testify for or against each other without consent. The rule laid down in *Pullen v. The People*, 1 *Doug. Mich.* 48, was the old common law rule which this statute was designed to supplant. The language seems so plain that I can not imagine a case to which it would apply if it will not apply to this.

Without passing upon the other questions raised, I am of opinion that the defendants should be discharged, and that no further proceedings be had upon the verdict.

MARTIN Ch. J.:

I fully concur with my brother Campbell.

CHRISTIANCY J.:

I concur with my brother Manning in holding that the information is sufficient for the case made by the proofs, and that the statute in question is constitutional.

The question suggested by my brother Campbell in reference to a plea of former conviction or acquittal in Canada, is one which does not arise in the case, as there was no such plea; and for this reason it can have no bearing upon the constitutionality of the statute as applied to this case.

Should this question ever arise, it will not, I think, be found much more difficult of solution in a manner consistent with the rights of a defendant, than in many other cases where a plea of former conviction or acquittal has been interposed. In most, if not in all cases, where such plea is put in, it is necessary to resort to proof dehors the record to establish it, and that before the trial on the merits. Nor, so far as I can discover, does the question of difficulty in procuring evidence from a foreign jurisdiction have any bearing upon the question: this is a difficulty which might and often does occur in every species of trial, where all parts of the transaction have occurred within the

State; and it is a difficulty which affects the prosecution even more than the defense; as the defendant under the tatute may take depositions out of the State if he please, while the prosecution can not, unless the defendant elect to do so.

But upon the question of the admissibility of Bell Morrissey, the wife of William Morrissey, in behalf of John Morrissey, to prove an alibi as to him, I concur with my brother Campbell, that her testimony was admissible under the act of March 11th, 1861. The act took effect from its date, and the trial seems to have been had the next day, and probably before the Court was aware of its passage.

I also concur with my brother Campbell, that the statute in reference to informations does not authorize a criminal prosecution by information when the defendant has been discharged on preliminary examination. This examination was, I think, intended as the principal safeguard against groundless or vindictive prosecutions which it was supposed might otherwise occur, where the interposition of the grand jury was dispensed with. The Legislature do not seem to have been willing to leave the question of prosecution to the judgment or discretion of the prosecuting officer alone. This safeguard would be swept away, and the purpose of the statute defeated, if the defendant could be put upon his trial upon an information after he had been discharged upon the examination.

.The statute provides that a defendant may waive an examination: and in *Washburn v. The People*, 10 *Mich.* 372, the majority of this Court held that the defendant might waive this right as well when called upon to plead to the information, as when brought before the examining magistrate. That in order to take advantage of the want of such examination, the defendant must plead it in abatement, or move to quash the information upon that ground; and if he did neither, he must be held to have waived the examination. But in the present case there is no

question of waiver, or of mere irregularity of proceedings prior to the information. The matter here is in bar of the whole proceeding by information; and, though the question might perhaps have been brought before the Court by motion to quash, and perhaps by plea to the jurisdiction, yet whenever the fact appears to the Court to be undisputed, in any stage of the case, I think it is the duty of the Court to arrest the proceedings, and that the defendant should therefore be allowed to show the fact under the plea of not guilty; as the whole jurisdiction of the Court to try the prisoner depends upon it.

Upon the two grounds above indicated, I think the verdict should be set aside; but as the fact of the acquittal upon the examination appears to have been undisputed, no new trial should be granted.

*Judgment reversed, and prisoners discharged.*